Daniel C. Peterson, OSB No. 064664
dpeterson@cosgravelaw.com
COSGRAVE VERGEER KESTER LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: (503) 323-9000
Facsimile: (503) 323-9019

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| REBECCA ADAMS SAVAGE, an individual; and OUTLAW INDUSTRIES LLC, an Oregon limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>ELEVENATE, INC., a Delaware corporation, ETANEVELE AB, a Swedish aktiebolag; and ELEVENATE AB, a Swedish aktiebolag,<br><br>Defendants. | Case No. 3:26-cv-00302-AB<br><br>**Plaintiffs' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>*Oral Argument Requested* |

## LOCAL RULE 7-1 CERTIFICATION

Counsel for plaintiffs, Rebecca Adams Savage ("Savage") and Outlaw Industries LLC ("Outlaw"), collectively ("Plaintiffs"), made a good faith effort to resolve this dispute through telephone conferences with counsel for Defendants. Those efforts were not successful.

## MOTION

Pursuant to Fed. R. Civ. P 56, Plaintiffs request that the court grant partial summary judgment in their favor and dismiss Defendants' First Counterclaim, Twelfth Affirmative Defense, and Thirteenth Affirmative Defense on the basis that the parties never entered into a valid, enforceable settlement agreement. This motion is supported by the Declaration of Rebecca Adams



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

Savage ("Savage Decl."), the Declaration of Daniel C. Peterson ("Peterson Decl."), the records and files herein, and the Points and Authorities below.

## POINTS AND AUTHORITIES

### I. INTRODUCTION

In this lawsuit, Plaintiffs allege that Defendants breached two separate contracts: the Restricted Common Stock Grant Agreement ("Stock Agreement") and Exclusive Service Agreement ("Service Agreement"). In answer, Defendants raise a counterclaim alleging that Plaintiffs entered into two separate binding and enforceable agreements for the sale of Savage's stock under the Stock Agreement, and termination of the Service Agreement (the "First Counterclaim"). Defendants' Twelfth and Thirteenth Affirmative Defenses to plaintiffs' breach of contract claims assert that the alleged agreements constitute accord and satisfaction and/or novation of the Stock and Service Agreements. Defendants' position is wrong – the parties never reached valid and enforceable agreements to alter the parties' obligations under the Stock and Service Agreements or otherwise resolve Defendants' obligations to Plaintiffs thereunder.

While it is true that over the course of several months between October 2025 and January 2026, Plaintiffs engaged in good faith negotiations with Defendants in an attempt to resolve outstanding claims and obligations under the Stock and Service Agreements, these negotiations were ultimately unsuccessful. Despite an unsuccessful negotiation process that spanned several months, dozens of emails exchanging proposed settlement terms, and many iterations of draft agreements, all with the understanding that no final settlement agreement would be enforceable absent a signed agreement in writing, Defendants offer up a single moment in that process and selectively isolate certain communications in an attempt to bind Plaintiffs to unenforceable drafts.



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

Defendants specifically refer to two draft agreements. First, defendants claim that the alleged draft "Settlement and Share Purchase Agreement" ("Draft SPA") has the effect of resolving all outstanding claims and obligations under the Stock Agreement. Second, Defendants claim that the alleged draft "Termination Agreement and General Release" ("Draft TAGR" and collectively with the Draft SPA, the "Drafts") has the effect of resolving all outstanding claims and obligations under the Service Agreement.

Neither of the Drafts is effective or enforceable because (i) the intention of all parties from the commencement of negotiations was that no agreement would be enforceable without being fully executed, (ii) the agreements they purport to supersede require that the Drafts be in writing and signed by all parties, and (iii) the Drafts so require under their own terms. Additionally, the Draft TAGR is, on its face, unenforceable and void in its entirety as a matter of law.

## II. BACKGROUND

The general background of this matter is known to the Court. Relevant facts specific to this motion are as follows:

### The Parties' Relationship

For purposes of this motion, Defendants are referred to as follows: Defendant Elevenate, Inc. will be referred to as "Elevenate." Defendant Etanevele AB will be referred to herein as "EAB." EAB was previously known as Elevenate AB. EAB is the corporate parent of Elevenate. The defendant entity currently known as Elevenate AB was previously known as Vebua AB, and to avoid confusion (or at least attempt to limit it) given the similar names, is referred to herein as "Vebua." At times herein, Elevenate, EAB, and Vebua are collectively referred to as "Defendants."

EAB was a manufacturer of ski apparel, general outdoor apparel, streetwear, accessories, and other consumer goods under the brand names "Elevenate" and "E11" (the "Products"). Savage



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

Decl., ¶ 2. Plaintiff Rebecca Adams Savage ("Savage") began working with EAB in 2015, when EAB engaged her to provide legal services related to the creation of Elevenate, EAB's U.S. subsidiary. *Id*. Shortly thereafter, Savage began working as an independent contractor on behalf of Elevenate to grow sales of the Products in the U.S. market. *Id*. Because of funding constraints, in lieu of payment for the services Savage provided, on August 9, 2016, EAB, Elevenate, and Savage entered into the Stock Agreement, granting Savage 350,000 common shares of Elevenate (the "Shares"), representing a 5.1% interest in the company. Savage Decl., ¶ 3; Ex. 1. Section 9(c) of the Stock Agreement, titled "Amendments and Waivers" states:

> ***No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing and signed by the parties to this Agreement***. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

*Id*. (emphasis added).

After having resigned in 2017, EAB contacted Savage in 2020, seeking her return to provide services to the business in the U.S., including management of marketing and sales nationwide. Savage Decl. ¶ 4. On December 7, 2020, EAB and Elevenate entered into the Service Agreement with Savage's company, Plaintiff Outlaw Industries LLC ("Outlaw"). *Id*, Ex. 2. Under Section 4, the Service Agreement automatically renews every year unless either party provides the other with notice of non-renewal before October 1 of the then-current year or unless otherwise terminated under its Section 9. Section 9 of the Service Agreement provided for termination by either Outlaw, individually, or Elevenate, individually. Section 10 (a)[1] of the Service Agreement titled "Waiver; modification" states:

[1] The provisions of section 10 are listed in alphabetical sequence and the provision named "Waiver; Modification" should have been marked letter "i" but was instead marked as a second letter "a".



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

> Failure of either party to insist upon performance or to exercise any right or privilege hereunder, or the waiver by either party of any breach of any of the terms or conditions of this Agreement, shall not be construed as a subsequent waiver of any such right, privilege, terms or conditions. ***This Agreement may only be amended by a written instrument signed by all of the parties hereto.***

*Id.* (emphasis added.)

In fall of 2025, Outlaw and Savage learned that Defendants and other related parties were undertaking a series of sham transactions in order to evade the existing obligations of Elevenate and EAB, including those obligations owed to Outlaw under the Service Agreement and to Savage under the Stock Agreement. Savage Decl., ¶ 5. Oscarson Invest AB ("Oscarson"), one of EAB's minority shareholders, acquired enough EAB shares to obtain a majority interest in EAB. *Id.* In October 2025, Oscarson caused all of EAB's assets, except for EAB's 95% ownership in Elevenate to be transferred to its wholly owned subsidiary, Vebua. *Id.*

After introducing herself to Savage, Vebua's newly appointed board chair, Ann-Charlott Eek, sent Savage an email on October 24, 2025, stating Vebua's intent to acquire EAB's shares in Elevenate, but that Vebua needed to resolve Savage's shares in Elevenate first. Savage Decl., ¶ 6, Ex. 3. In that email, Vebua offered to purchase Savage's shares for $50,000 upon "***signing*** a contract to that effect." *Id.* (emphasis added). In the same email, Ms. Eek expressed Vebua's desire to unilaterally shorten the term of the Service Agreement. *Id.* However, Ms. Eek led Savage to understand that the shortening of the term of the Service Agreement was intended to allow Vebua to evaluate the U.S. market, and that Vebua intended to continue its working relationship with Savage and Outlaw. *Id.* Unfortunately, despite months of negotiations of a share purchase agreement to resolve Savage's interest under the Stock Agreement and to amend the Service Agreement, Defendants failed to follow through on finalizing the transaction in a manner acceptable to Savage and Outlaw.



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

**The Alleged Settlement**

In their First Counterclaim, Defendants allege that the parties reached agreements resolving the outstanding issues between them on January 9 and January 10, 2026. [Dkt. 6 at ¶¶ 67-75]. Defendants' limited recitation of the facts surrounding the alleged agreements, however, are incomplete and misleading, and the allegation that the parties had reached enforceable agreements to supersede the prior contracts is false.

Beginning on December 31, 2025, in an effort to pressure Savage into settlement on unacceptable terms, over the course of a couple of weeks Defendants set a series of unrealistic deadlines backed by false urgency, continued to ignore Savage's specific conditions for settlement, and refused to consider Savage's settlement proposals or proposed documents. Throughout the ensuing communications over the following weeks, it was expressly understood by the parties that any final agreement would only be effective when in writing and signed, as required under the Drafts as well as the Stock Agreement and Service Agreement.

On December 31, 2025, Ms. Eek communicated an ultimatum via email that Defendants would only be willing to resolve Plaintiffs' relationship with Defendants on the following terms: Vebua would pay Savage $50,000 for her shares in Elevenate and Vebua would pay Outlaw $100,000 (including amounts that were already due under the Service Agreement on January 1, 2026) in exchange for termination of the Service Agreement, effective immediately. Savage Decl., ¶ 7, Ex. 4. By this point, from Savage's perspective, the relationship between Defendants and Plaintiffs had become so irretrievably broken that a clean break was the best course. *Id.* Savage responded to Ms. Eek, "I appreciate the offer in your email today and hope it can lead to the clean break we both have been wanting." Savage Decl., ¶ 8, Ex. 5



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

Savage went on to say she would accept the proposed financial terms, but only upon certain specific conditions, including prompt payment and that "[t]he stock transfer will be documented by ***a simple stock transfer power*** and the ESA will be terminated by a short, ***simple document*** releasing and terminating all obligations of the parties thereunder except for Section 6, Confidential Information, which by its terms survives contract termination, and Section 8, Indemnification; Limitation of Liability, which shall also be binding on [Vebua]." *Id*. (emphasis added). Savage added that she would be amenable to a mutual non-disparagement clause, but, importantly, stated: "No new obligations will be entertained." *Id*. Savage's email concluded with: "Note that the above is being offered without prejudice to Outlaw's or my rights, all of which are reserved until final payment and settlement." *Id*.

On January 2, 2026, Ms. Eek responded to Plaintiffs' terms via email saying "we are in agreement," Defendants would await contracts from Plaintiffs' counsel, and "will prepare to execute on agreements and payment." Savage Decl., ¶ 9, Ex. 6 (emphasis added).

On January 4, 2026, Plaintiffs' counsel sent Defendants' counsel draft agreements that complied with Savage's stated conditions to which Defendants had agreed. Peterson Decl., ¶ 2, Ex. 1. Unfortunately, instead of executing the documents consistent with the agreement between Eek and Savage, Defendants promptly reneged. Ignoring the drafts provided by Plaintiffs, on January 5, 2026, Defendants then-U.S. counsel, Steve Suneson sent Plaintiffs' counsel the Draft SPA and the Draft TAGR. Peterson Decl., ¶ 3, Ex. 2; Ex. 3; Ex. 4. Despite Defendants' agreement to the contrary, the Drafts contained multiple additional obligations outside the agreed upon terms and were completely at odds with the explicit conditions to which Ms. Eek had agreed. Savage Decl., ¶ 10. On January 7, Savage communicated to Ms. Eek her rejection of the Drafts, informed Ms. Eek



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

that she would be traveling for business and unavailable to address any drafts through January 14, 2026, and instructed that Suneson refrain from contacting Plaintiffs' counsel. *Id.*, Ex. 7.

On January 9, knowing Savage was traveling, Suneson contacted Plaintiffs' counsel acknowledging Savage had rejected the Drafts and that he had been explicitly instructed not to communicate with Plaintiffs' counsel, but stated "your client will definitely want to know what I am about to discuss with you" and "this is urgent." Peterson Decl. ¶ 4, Ex. 5. Mr. Suneson provided no explanation for the urgency or the reason the matter needed to be dealt with while Savage was unavailable. *Id*. Later on January 9, Suneson sent another copy of the Drafts to Plaintiffs' counsel, stating "No further changes will be entertained. The offer for your client to accept ends at 5:00pm Pacific Time tomorrow (Saturday, January 10, 2026). After such time, the offer is automatically revoked...." Peterson Decl. ¶ 5, Ex. 6.

On January 9, at the time Defendants issued their ultimatum, Savage was under considerable pressure and stress with her business activity (especially with the knowledge that she would no longer be receiving income from Elevenate). Savage Decl., ¶ 11. Given Defendants' conduct in the preceding months, she desired nothing more than a "clean break" from Defendants, and in an effort to be able to move on, Savage had Plaintiffs' counsel propose a counteroffer to the Drafts. *Id*. However, upon further review, Savage determined that she was unable to move forward on the terms set forth in the Drafts because they imposed too many objectionable provisions including provisions that bound her personally to future obligations in contravention of her explicit condition of "No new obligations." *Id*. Simply, Savage feared that if she executed the Drafts, the "clean break" which was so fundamental to her would not be realized based on the totality of her experience with Defendants since the Oscarson/Vebua takeover and, especially, Defendants' conduct related to their ultimatum. *Id*.



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

Plaintiffs never executed the Drafts, each side issued notices of termination, and this litigation commenced.

## III. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the initial burden is met, the opposing party must then set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

Defendants allege in the First Counterclaim that the Draft SPA and Draft TAGR are enforceable agreements which were breached by Plaintiffs. To succeed on a claim for breach of contract in Oregon or California,[2] a party must first establish the existence of a valid, binding agreement. *Sym-Agro, Inc. v. Seipasa, S.A.*, 2021 Case No. 3:21-CV-00429-HZ, 2021 WL 1784631, at *4 (D. Or. May 5, 2021) (quoting *Gunderson LLC v. BCG Props. Grp., Inc.*, Case No. 3:19-cv-01569-AC, 2020 WL 1529356, at *5 (D. Or. Mar. 30, 2020)); *Aton Ctr., Inc. v. United Healthcare Ins. Co.*, 93 Cal. App. 5th 1214, 1230 (2023). Summary judgment on a breach of contract claim is appropriate when a party cannot establish the existence of a valid binding agreement. *Aton*, 96 Cal. App. 5th at 1230; *Moyer v. Columbia State Bank*, 315 Or. App. 728, 737 (2021).

Similarly, under both Oregon and California law, Defendants' affirmative defense for accord and satisfaction or novation presupposes the existence of a valid contract superseding, extinguishing, or satisfying the underlying agreement. *See, e.g.*, *Miles v. Bowers*, 49 Or. 429, 432 (1907) ("One of the essential elements to a novation is that there should have been an extinguishment of the old debt, and . . . a mutual agreement between all of the parties that the old debt should become the obligation of a new debtor."); *Kilander v. Blickle Co.*, 280 Or. 425, 428 (1977) ("the premise of an accord and

[2] By their terms, the Stock Agreement and the Draft SPA are governed by California law and the Service Agreement and Draft TAGR are governed by Oregon law.



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

satisfaction is contractual"); *Garthofner v. Edmonds*, 74 Cal. App. 2d 15, 20, (1946) ("an essential element of every novation is a new contract to which all the parties concerned must agree, and in the absence of such agreement or consent a novation cannot be effected"); *BII Fin. Co. v. U-States Forwarding Servs. Corp.*, 95 Cal. App. 4th 111, 127 (2002) (finding that a defendant's failure to provide evidence of an agreement of an accord and satisfaction was fatal to the affirmative defense).

## IV. ARGUMENT

### A. Summary judgment is warranted because the Draft TAGR and Draft SPA do not constitute binding, enforceable agreements without the signatures of all parties

*i. The Draft SPA and the Draft TAGR require signatures to be valid.*

As an initial matter, it should be noted that both Drafts require signatures of all parties to be valid. The Draft SPA references "execution" or "executed" as a condition of effectiveness throughout. For example, in Section 2 of the Draft SPA, it states that closing "shall take place immediately after the ***execution*** of this Agreement." Peterson Decl., ¶ 3, Ex. 3 (emphasis added). In Section 4(iv), the Draft SPA states, "the ***execution*** of this Agreement does not constitute in any manner whatsoever an admission of liability…". *Id*. (emphasis added). Section 7.4 states that the Agreement may be "***executed*** in several counterparts by one or more of the undersigned", which taken together shall be "deemed to be one final Agreement, as if one document had been ***signed*** by all parties." Id. (emphasis added).

The Draft TAGR contains similar provisions. In Section 4(c), the Draft TAGR states that the parties "acknowledge that the ***execution*** of this Agreement containing these release provisions will not relieve any Party from the legal obligation to comply with the provisions of the Agreement." Peterson Decl., ¶ 3, Ex. 4 (emphasis added). Section 11(e) states that the "Agreement may be ***signed*** in any number of counterparts which when taken together form one complete and ***executed*** Agreement." *Id*. (emphasis added). Notably, the Draft TAGR requires any amendments to its terms



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

to be set forth in a written instrument "***executed*** by all of the Parties affected by such amendment(s)." *Id*. (emphasis added). It would be nonsensical to require amendments to be signed, but not the underlying agreement.

It cannot be disputed that the Drafts were not executed by the Plaintiffs. Execution is a prerequisite to a binding agreement under the Drafts, and Plaintiffs are entitled to the partial summary judgment sought in this motion.

*ii. The Draft TAGR is not enforceable because the Service Agreement may only be amended by a written instrument signed by all of the parties.*

When the relevant terms of a contract are unambiguous, summary judgment is appropriate. *Milne v. Milne Const. Co.*, 207 Or. App. 382, 388 (2006). A term in a contract is unambiguous when it is susceptible to only one "reasonable and sensible construction." *Or. Trail Elec. Consumers Co-op, Inc. v. Co–Gen Co.*, 168 Or. App. 466, 474 (2000). Generally speaking, when parties to a contract execute a subsequent contract respecting the same matter, and the second contract is inconsistent with the first, the second agreement is deemed to have superseded the prior contract. *Nicholson v. Hardwick*, 49 Or. App. 169, 175 (1980). However, this cannot be the case when the question at issue relates to the existence, validity, or enforceability of a subsequent agreement; in fact, "a novation is never presumed, and the burden is on the party asserting that a novation has taken place to establish all the essential elements by legal and sufficient evidence." *Credit Bureaus Adjustment Dep't, Inc. v. Cox Bros.*, 207 Or. 253, 258 (1956).

Here, because the subsequent agreement Defendants seek to enforce is a termination of Defendants' obligations under the Service Agreement, there is no presumption of validity of the Draft TAGR, and Defendants cannot rely on the Draft TAGR itself to invalidate or supersede the provisions of the Service Agreement that expressly govern termination or amendment/modification



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

of the Service Agreement, as the Draft TAGR purports to do. When a defendant seeks relief from the terms of a contract by arguing a subsequent contract supersedes the prior contract, the court will only grant relief to the extent that the terms of the original contract do not unambiguously govern the outcome. For example, in *Web Analytics,* a defendant argued that an agreement terminating a service contract foreclosed its duty to make payments under a specific term of the contract. The court disagreed, however, and granted summary judgment in favor of the plaintiffs on the basis that the original agreement specifically provided that payment under that term *would survive any termination of the agreement. See Web Analytics Demystified, Inc. v. Keystone Sols., LLC,* No. 3:13-CV-1304-HU, 2015 WL 882577, at *3 (D. Or. Mar. 2, 2015).

A similar situation is at play here. To the extent Defendants argue that the Draft TAGR terminates and supersedes the Service Agreement, foreclosing any claims or obligations thereunder, they will only succeed if the Service Agreement does not unambiguously provide terms for its own termination and modification. The Service Agreement *does* unambiguously provide terms for its own modification and termination. First, under Section 4 of the Service Agreement, the Service Agreement automatically renews and continues "unless terminated *as provided in Section 9*." Savage Decl., Exhibit 2 at 6. (emphasis added). Before the Oscarson/Vebua takeover in October of 2025, the term of the Service Agreement had renewed through December 31, 2026. Consequently, thereafter, the sole methodology for termination of the Service Agreement was "as provided in Section 9."

For its part, Section 9 of the Service Agreement does not contemplate termination in the manner described by the Draft TAGR. Section 9 unambiguously contemplates termination in four ways: (1) termination by Elevenate with cause as defined therein; (2) termination by Elevenate without cause as defined therein; (3) termination by Outlaw for material violations by Elevenate, as



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

defined therein; or (4) termination by Outlaw due to the winding up of Elevenate as defined therein. *Id*. at 8–9. Additionally, Section 9 unambiguously provides terms for prior notice and payment by Elevenate of its outstanding obligations to Outlaw under each of the different methods for terminating the Service Agreement. *Id*.

No plausible reading of the Draft TAGR could conclude that the Draft TAGR terminates the Service Agreement in one of the four manners prescribed under Section 9. The only reasonable construction of the Draft TAGR is that it attempts to amend the Service Agreement to provide for mutual termination of the Service Agreement and a lump sum payment in settlement of Elevenate's outstanding obligations to Outlaw. A facial reading of the two agreements means there can be no genuine dispute that in drafting the Draft TAGR, the parties were seeking to amend the terms for termination of the Service Agreement.

However, the Service Agreement *also* unambiguously provides terms for its own amendment or modification. Under Section 10(a), the Service Agreement may only be amended or modified through a "written instrument *signed* by all the parties hereto." *Id*. at 10. (Emphasis added). On its face, the Draft TAGR reveals that the parties understood it to be a modification or amendment to the Service Agreement, as they had mutually prepared a written instrument and included signature blocks for all of the original parties to the Service Agreement. Had Outlaw chosen to sign, the Draft TAGR may have, perhaps, been enforceable, but Outlaw did not sign the Draft TAGR, and so it is not a valid, enforceable amendment to the Service Agreement.

While, under some circumstances, Oregon law allows that "parties may modify a written contract orally even if the writing contain an express provision against nonwritten modifications," *Bennet v. Farmers Ins. Co. of Oregon*, 332 Or. 138, 147 n7 (2001) (citing *Moore v. Mutual of Enumclaw Ins. Co.*, 317 Or. 235, 240–41 (1993), those circumstances are dictated by the history of



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

the parties' customary dealings with each other and "depend on the particular circumstances of each case." *Moore*, 317 Or. at 240.

For example, in *Fisher v. Tiffin*, the Oregon Supreme Court found that a vendor's long-standing practice of accepting late payments constituted waiver of time provisions despite a nonwaiver clause in its contract with the buyer. *Fisher v. Tiffin*, 275 Or. 437, 441, (1976). Here, the evidence shows no such understanding or any sort of accepted practice between Plaintiffs and Defendants with respect to the means for terminating the Service Agreement other than as provided in Section 9. On the contrary, the communications between Defendants and Plaintiffs during the process of attempting to negotiate a settlement of the Service Agreement reveal that neither party intended to be bound by oral or email modifications, amendment, waivers, novations, or any other form of superseding agreement absent a signature by all of the parties.

An instructive example of this would be Defendants' January 2, 2026, email agreeing to the settlement terms proposed by Plaintiffs and statement that they would await draft agreements from Plaintiffs' counsel. Savage Decl., Exhibits 5 and 6. By Defendants' reasoning, this communication would constitute acceptance and formation of a binding agreement under the terms proposed by Plaintiffs. Instead, when on January 4 Plaintiffs sent draft agreements in accordance with the agreed terms, Defendants reneged and responded with different terms (their proposed Drafts) the following day on January 5. Peterson Decl., ¶ 3. Plaintiffs did not seek enforcement of the terms discussed on December 31, despite Defendants' assent, because it was the understanding of all the parties that no settlement of the Service Agreement would be effective until written and ***signed*** by all parties as required under Section 10(a) of the Service Agreement. Defendants' hypocritical attempt to now seek enforcement of terms that were never understood by the parties to be valid absent a signed writing by all parties is ineffective because under Oregon law "[w]here it is clearly understood that



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

the terms of a proposed contract, though tentatively agreed on, are to be reduced to writing and signed before it is complete and binding on the parties, there is no final contract until that is done." *General Realty Corp. v. Douglas Lowell, Inc.*, 223 Or 244, 254 (1960).

Because the parties clearly understood that any settlement of the Service Agreement would not be effective until in writing and signed by both parties, Defendants cannot demonstrate that the Draft TAGR is not governed by the Service Agreement's requirement that any amendment or modification be in writing and signed by all the parties. Accordingly, the Draft TAGR does not constitute a valid, enforceable agreement, and the court should grant summary judgment in Plaintiffs' favor on Defendants' First Counterclaim and Twelfth and Thirteenth Affirmative Defenses as they relate to the Draft TAGR and Service Agreement.

*iii. The Draft SPA is not enforceable because the Stock Agreement permits no waiver of any rights absent a signed writing by the parties to the Agreement*

Similarly, Section 9(c) of the Stock Agreement also unambiguously provides that "no modification of or amendment to this Agreement, nor waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement." The Draft SPA explicitly is intended to operate as a waiver of rights under the Stock Agreement. Section 3 of the Draft SPA is titled "Waiver of Rights and Claims" and states, among other things, that Savage:

> [H]ereby irrevocably and unconditionally waives, releases, and forever discharges any and all drag-along rights, tag-along rights, pre-emption rights, rights of first refusal, co-sale rights, consent rights, veto rights, information rights, or any other contractual, statutory, or equitable rights, privileges, or entitlements whatsoever that [Savage] has or may have, whether arising under or in connection with the Stock Agreement . . . including, without limitation, all rights specifically granted to [Savage] under Sections 5 and 6 of the Stock Agreement . . . all of which are expressly and irrevocably waived and released in their entirety.
>
> Draft SPA, Section 3.1.
>
> [Savage] further forever waives and releases any and all claims, demands, causes of action, liabilities, or proceedings of any kind or nature whatsoever, whether known or unknown,



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

> asserted or unasserted, contingent or actual, and in law or in equity, which [Savage] has or may have against Elevenate Inc., Elevenate AB or any of their respective shareholders, directors, officers, employees, or affiliates, arising out of or in connection with (i) the Stock Agreement, or any of the rights referred to in clause 3.1, and
> (ii) any rights [Savage] may have in her capacity as a shareholder of Elevenate Inc. Upon receipt by [Savage] of the Purchase Price such waiver and release shall be absolute, final, and binding, and [Savage] acknowledges and agrees that:
> (a) all such rights, claims, and entitlements shall be deemed to have been fully satisfied, extinguished, and of no further force or effect as of the date hereof, including without limitation, for the avoidance of doubt, any rights that would otherwise arise or become exercisable on or after 1 December 2026 pursuant to Section 6(d) of the Stock Agreement, or in connection with any future sale, transfer, issuance, transaction, dissolution, merger, or other corporate action involving Elevenate Inc., Elevenate AB, or any of their respective shares or assets;
> (b) [Savage] shall not assert, pursue, or attempt to enforce any such right, claim, or entitlement, directly or indirectly, now or in the future, and has not transferred, assigned, or otherwise disposed of any part of or interest in any such right, claim, or entitlement; and
> (c) the waiver and release extend to any and all future corporate actions, transactions, transfers, or restructurings involving Elevenate, Inc. or its shareholders, whether or not contemplated as of the date hereof.

Draft SPA, Section 3.2.

The U.S. District Court for the Northern District of California has held that an unsigned settlement agreement that purported to supersede a pre-existing agreement between two parties was not valid and enforceable where, as is the case here, the pre-existing agreement explicitly required that any modifications be signed and executed by both parties. *Fontana v. Chefs' Warehouse, Inc.*, No. 16-CV-06521-HSG, 2017 WL 2591872, at *3 (N.D. Cal. June 15, 2017). In *Fontana*, plaintiff-employee and defendant-employer had previously signed an Arbitration Agreement. *Id*. at *1. Subsequently, defendant terminated plaintiff's employment and offered him a Severance Agreement. *Id*. Plaintiff attempted to re-negotiate and requested additional compensation. *Id*. Defendants refused and said the as-is offer would expire on May 27, 2016. *Id*. Ultimately, plaintiff signed the Severance Agreement and returned it to defendants.

On May 27, defendants' chief human resources officer acknowledged, via email, that she received it and would send a check by June 2. *Id*. Instead, defendants never signed the agreement



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

and e-mailed plaintiff on June 1 to say they were rescinding the Severance Agreement. *Id*. The Severance Agreement did not contain an arbitration clause. *Id*. Defendants filed a motion to compel arbitration pursuant to the Arbitration Agreement. *Id*.

Plaintiff argued that the partially-executed Severance Agreement superseded the Arbitration Agreement. *Id*. at *2. However, the court noted, "Plaintiff offers no factual or legal authority to support this contention" and "here, [p]laintiff has not provided evidence that the unsigned Severance Agreement is a valid contract at all, let alone one that superseded the Arbitration Agreement." *Id*. at *3. The *Fontana* court granted the defendants' motion to compel arbitration stating: "[w]hen it is clear ... that the proposed written contract would become operative only when signed by the parties[ ], the failure to sign the agreement means no binding contract was created." *Id*. (quoting *Basura v. U.S. Home Corp.*, 98 Cal. App. 4th 1205, 1216 (Cal. Ct. App. 2002)).

Defendants can produce no evidence that the Stock Agreement's requirement that any waiver or amendment be in writing and signed by all the parties does not govern. Consequently, the Draft SPA does not constitute a valid, enforceable agreement because Savage never signed it. For this reason, the court should grant summary judgment in Plaintiffs favor on defendants' First Counterclaim and Twelfth and Thirteenth Affirmative Defenses as they relate to the Draft SPA and Stock Agreement.

*iv. Subsequent to the time Defendants allege the Drafts became enforceable, Defendants' counsel admitted in writing that the Drafts were not enforceable.*

Defendants' sole basis for asserting the First Counterclaim and Twelfth and Thirteenth Affirmative Defenses was an email exchange between the parties' respective counsel on January 9-10, 2026, that Defendants assert resulted in "enforceable agreements to supersede the prior contracts." [Dkt. 6 at ¶ 68]. However, Defendants themselves never believed that such email



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

exchange rendered the Drafts enforceable. On January 10, after the earlier email exchange, counsel for Defendants emailed Plaintiffs' counsel, stating, "***the documents are NOT legally binding*** unless and until your client actually receives the funds**. *My client will not initiate the wire until we have evidence your client has pre-signe*d** and signatures are in my firm's escrow**.** . . . Your client has absolutely no risk under these circumstances." Peterson Decl., ¶ 6, Ex 7 (emphasis substituted from original). This email was a reiteration of a prior email sent by Defendants' counsel to Savage on December 19, 2025, in which he stated "while agreements will be signed in escrow before the receipt of the wire no agreements will be released from escrow, i.e., ***not legally effective***, until you have actually received the payments." Savage Dec., ¶ 12, Ex 8 (emphasis added). In addition to all the above, Plaintiffs relied on these assurances in deciding not to proceed with Defendants' ultimatum. *Id.*

### B. Non-severable provisions of the Draft TAGR violate state statute and render the entire draft void.

Summary judgment is appropriate to preclude an action to enforce a provision of a contract that is prohibited by statute. *Pacific Veterinary Hosp., P.C. v. White*, 72 Or. App. 533, 537–38 (1985) (affirming trial court's entry of judgment on a non-compete covenant that violated state statute). The rule in Oregon with respect to requests by a party to enforce provisions of a contract that contravene law is that "[c]ourts generally refuse to help someone who complains that an illegal promise has not been performed." *Mountain Fir Lumber Co., Inc. v. Employee Benefits Ins. Co.*, 296 Or. 639, 643 (1984). Specifically, "[i]f a statute having a penalty and a prohibition, express or implied, or only a penalty or only a prohibition, is silent and otherwise contains nothing from which the contrary is to be inferred, then an agreement which conflicts with the statute is void." *Id.* (quoting *Uhlmann v. Kin Daw*, 97 Or. 681, 689 (1920)). If the purpose of a contract is against public policy on its face, it will not be enforced, and such public policy "may be found in legislative



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

enactments." *Compton v. Compton*, 187 Or. App. 142, 145 (2003). "An agreement is illegal if it violates a statute or cannot be performed without violating a statute." *Id*.

In *Compton*, the Oregon Court of Appeals established that the test for determining if a contract is void and unenforceable on this basis is whether the statute *expressly* prohibits a performance agreed upon in the contract. *Id*. at 147. The court of appeals upheld a contract by a guardian agreeing to provide financial support to a minor because, while state statute did not create an obligation in the guardian to provide such support, it did not prohibit "voluntary, private agreements." *Id*.

Here, the Draft TAGR contains a provision that violates an express prohibition of state statute. ORS 646A.097 governs the payment of sales commissions following the termination of a contract between a sales representative and a principal. Section 8 of the statute provides that: "[a] provision in any contract between a sales representative and a principal *purporting to waive any provision of this section*, whether by expressed waiver or by a contract subject to the laws of another state, *shall be void*." (Emphasis added). Among its essential provisions, Section 4(a) of the Draft TAGR, titled "Mutual Release By Outlaw" includes a waiver and release of all claims by Outlaw arising out of the Service Agreement "includ[ing], without limitation, any rights or claims under Oregon's sales representative statute set forth in ORS 646A.097." This provision is plainly void as a matter of law as, on its face, it constitutes an attempt to waive provisions of ORS 646A.097.

Under Oregon law, the question of severability of a void or invalid contract provision "depends primarily upon the intention of the parties as determined by the ordinary rules of construction, having regard to the language used by the parties[.]" *Pettigrove v. Corvallis Lumber Mfg. Co.*, 143 or. 33, 35 (1933). The intention of the parties as to severability of the various provisions in the Draft TAGR is readily ascertainable, as the draft includes an unambiguous



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

severability clause susceptible to only one possible interpretation. Section 11(d) of the Draft TAGR states: "If any provision or portion hereof, *other than Sections 2, 3, and 4,* is determined to be unenforceable by a court of competent jurisdiction, the remaining portion of the Agreement shall remain in full force an effect." (Emphasis added). It is clear that the intention of the parties was that the proposed agreement would survive and be severable from any invalid provisions or portions of provisions *except* for Sections 2, 3, and 4. Because Section 4's attempted waiver of rights under ORS 646A.097 is void as a matter of law, it is not severable from the remainder of the document and the Draft TAGR is void in its entirety. For this reason, the court should grant summary judgment in Plaintiffs' favor on defendants' First Counterclaim and Twelfth and Thirteenth Affirmative Defenses as they relate to the Draft TAGR and Service Agreement.

## CONCLUSION

Through their First Counterclaim and Twelfth and Thirteenth Affirmative Defenses, Defendants seek to enforce the Draft TAGR and the Draft SPA. However, the Drafts, by their own terms, by the terms of the agreements they are seeking to amend or terminate, and by the repeated written confirmation of Defendants' counsel, require signatures to be effective. It cannot be disputed that Savage and Outlaw never signed the Drafts and that, therefore, no binding and valid agreement was reached. Furthermore, the Draft TAGR is entirely void as a matter of law. Plaintiffs are entitled to the relief requested herein.

DATED: April 22, 2026

COSGRAVE VERGEER KESTER LLP

***s/ Daniel C. Peterson***
Daniel C. Peterson, OSB No. 064664
Telephone: 503-323-9000
Fax: 503-323-9019
E-mail: dpeterson@cosgravelaw.com
Of Attorneys for Plaintiffs



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019

# CERTIFICATE OF SERVICE

I hereby certify that I caused to be served a true and correct copy of the foregoing **Plaintiffs' MOTION FOR PARTIAL SUMMARY JUDGMENT** on the date indicated below by:

☐ mail with postage prepaid, deposited in the US mail at Portland, Oregon,

☐ hand delivery,

☐ facsimile transmission,

☐ overnight delivery,

☐ email (courtesy copy),

☒ electronic filing notification.

I further certify that the copy was delivered as indicated above and addressed to the following attorneys listed below:

Francis J. Torrence
Andrew S. Gard
Lewis Brisbois Bisgaard & Smith LLP
888 SW Fifth Avenue, Suite 900
Portland, OR 97204
francis.torrence@lewisbrisbois.com
andrew.gard@lewisbrisbois.com
Of Attorneys for Defendants

DATED: April 22, 2026

***s/ Daniel C. Peterson***
Daniel C. Peterson



Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: 503-323-9000
Facsimile: 503-323-9019