IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

REBECCA ADAMS SAVAGE and
OUTLAW INDUSTRIES, LLC, an Oregon
limited liability company,

Plaintiffs,

v.

ELEVENATE, INC., a Delaware corporation;
ELEVENATE AB, a Swedish aktiebolag; and
ETANAVELE AB, a Swedish aktiebolag,

Defendants.

Case No. 3:26-cv-00302-AB

OPINION & ORDER

Michael C. Willes
M. Joshua Masser
Willes Law, P.C.
1120 SE Madison Street
Portland, OR 97214

Attorneys for Plaintiffs

Andrew Gard
Francis Torrence
Lewis Brisbois Bisgaard & Smith LLP
888 SW Fifth Avenue Suite 900
Portland, OR 97204-2025

Attorneys for Defendants

**BAGGIO, District Judge:**

Plaintiffs Rebecca Adams Savage and Outlaw Industries, LLC bring this case against Defendants Elevenate, Inc. ("Elevenate"), Elevenate AB ("Vebua"), and Etanavele AB ("EAB"). Plaintiffs allege breach of contract, violation of Oregon Revised Statute § 646A.097, and intentional interference with contractual relations. Torrence Decl. Ex. 1, ¶¶ 23–42, ECF No. 2. Defendants assert various affirmative defenses and bring two counterclaims. *See generally* Defs.' Answer & Countercls., ECF No. 6. Plaintiffs move for summary judgment on Defendants' first counterclaim and twelfth and thirteenth affirmative defenses. Pls.' Mot. Partial Summ. J. ("Pls.' MPSJ") 1, ECF No. 34; *see also* Defs.' Answer & Countercls. ¶¶ 58–61, 67–75. The Court held oral argument on Plaintiffs' Motion on October 23, 2026. For the following reasons, the Court grants Plaintiffs' Motion.

## BACKGROUND

From 2015 to 2017, Plaintiff Savage worked for Elevenate and EAB.[1] *See* Savage Decl. ¶¶ 2, 4. In lieu of payment for Plaintiff Savage's services, on August 9, 2016, Elevenate, EAB, and Plaintiff Savage entered into a Restricted Common Stock Grant Agreement which granted to Plaintiff Savage 350,000 common shares of Elevenate—representing a 5.1% interest in the business. *Id.* ¶ 3; *see also* Savage Decl. Ex. 1, ECF No. 36-1. Plaintiff Savage resigned in 2017. Savage Decl. ¶ 4.

In 2020, Plaintiff Savage—through her company Plaintiff Outlaw—started working for Elevenate and EAB again. *Id.* Elevenate, EAB, and Plaintiff Outlaw thus entered into an Exclusive Service Agreement on December 7, 2020. *Id.*; Savage Decl. Ex. 2, ECF No. 36-2.

---

[1] Elevenate was EAB's United States subsidiary. Savage Decl. ¶ 2, ECF No. 36.

In October 2025, all of EAB's assets, excluding its ownership interest in Elevenate, were transferred to Vebua. Savage Decl. ¶ 5. That same month, Vebua inquired into whether Plaintiff Savage was willing to sell her shares in Elevenate. Eek Decl. ¶ 9, ECF No. 41. On October 24, 2025, Ann-Charlotte Eek—Board Chair of Vebua, *id.* ¶ 1—emailed Plaintiff Savage an offer from Vebua to purchase Plaintiff Savage's shares in Elevenate as well as enter into a six-month service agreement with Plaintiff Outlaw, *id.* ¶ 10; *see also* Savage Decl. Ex. 3, ECF No. 36-3. No agreement was formed. *See* Eek Decl. ¶ 12.

On December 31, 2025, Eek emailed Plaintiff Savage another offer. Savage Decl. ¶ 7. The offer provided that Elevenate, through a contribution from Vebua, would purchase Plaintiff Savage's shares in Elevenate for $50,000 and that Vebua would pay Plaintiff Outlaw $100,000 to terminate the Exclusive Service Agreement. Torrence Decl. Ex. C, at 1, ECF No. 40-3; Eek Decl. ¶ 12. That same day, Plaintiff Savage accepted the offer, subject to several conditions. *See* Torrence Decl. Ex. D, at 1–2, ECF No. 40-4. Plaintiff Savage's email also stated: "If you are in agreement with the conditions stated above, . . . I will have my Oregon attorney contact Steve Suneson to finalize the documents." Torrence Decl. Ex. D, at 2. On January 2, 2026, Eek emailed Plaintiff Savage "we are in agreement" and that "[o]ur lawyer is standing by for a contact from your lawyer." Torrence Decl. Ex. E, at 1, ECF No. 40-5.

On January 4, 2026, Plaintiffs' counsel, Daniel Peterson, emailed Defendants' counsel with proposed agreements relating to the purchase of Plaintiff Savage's shares in Elevenate and the termination of the Service Agreement. Peterson Decl. ¶¶ 1–2, ECF No. 35. Peterson's email stated that Plaintiff Savage "is ready to finalize and sign the attached as soon as we get your approval." Peterson Decl. Ex. 1, ECF No. 35-1. The next day, Defendants' counsel, Steven Suneson, responded to Peterson's email with redlines to the proposed termination agreement and

additional documents relating to the stock transfer. Torrence Decl. Ex. F, at 3–4, ECF No. 40-6. On January 7, 2026, Eek emailed Plaintiff Savage directly stating that Defendants were prepared for payment and that "[w]e are waiting for your wiring instructions for the funds to reach Outlaw post signing." Suppl. Savage Decl. Ex. 1, ECF No. 44-1. Later that day, Plaintiff Savage emailed Eek rejecting Defendants' proposed agreements. Savage Decl. ¶ 10; Savage Decl. Ex. 7, ECF No. 36-7.

On January 9, 2026, after a phone conversation between Peterson and Suneson, Suneson resent Defendants' proposed agreements to Peterson, this time with a deadline for Plaintiffs to accept: "The offer for your client to accept ends at 5:00pm Pacific Time tomorrow (Saturday, January 10, 2026). After such time, the offer is automatically revoked . . . ." Torrence Decl. Ex. F, at 3; Suneson Decl. ¶ 3, ECF No. 42. That evening, Peterson responded to Suneson's offer stating that Plaintiff Savage "accepts Elevenate's offer with two clarifications." Torrence Decl. Ex. F, at 2. Peterson also stated: "Please send signature ready documents, and [Plaintiff Savage] will sign – I will hold them pending confirmation of receipt of funds." *Id.* at 3.

On January 10, 2026, Suneson sent Peterson "clean execution versions" of the agreements—specifically a Termination Agreement and General Release (TAGR) and Settlement and Share Purchase Agreement (SPA)—accepting Plaintiff Savage's clarifications. *Id.* at 1–2; Torrence Decl. Ex. J, ECF No. 40-10; Torrence Decl. Ex. K, ECF No. 40-11. Suneson stated that the agreements were "ready to be signed." Torrence Decl. Ex. F, at 2. Suneson also provided escrow instructions:

> We will each have our clients pre-sign all of the documents (two on my end, three on your end (i.e., plus stock power). You will send by email your client's signed signature pages to my firm to hold in escrow. I will send by email my client's signed signature pages to your firm to hold in escrow. Once all signed documents have been received in escrow per the foregoing, my client will initiate the wire on Monday (international wires may not hit until the next day). Once we have

> confirmation that the wire has actually hit [Plaintiff Savage's] account(s), all signed signature pages will be automatically released from escrow and have effect, and my firm will thereafter generate fully signed deal documents (attaching the exhibits) and circulate. Please confirm your agreement.

*Id.* Later that day, Peterson responded that he had sent the SPA and TAGR to Plaintiff Savage to sign. *Id.* at 1. Peterson also proposed a different escrow process, *see id.*, which Suneson subsequently rejected: "As you know, the documents are NOT legally binding unless and until your client actually receives the funds. My client will not initiate the wire until we have evidence your client has pre-signed and signatures are in my firm's escrow[,]" Peterson Decl. Ex. 7, at 1, ECF No. 35-7.

On January 11, 2026, Suneson sent to Peterson signature pages from the TAGR and SPA signed by Defendants. Suneson Decl. ¶ 4; Suneson Decl. Ex. A, at 2, ECF No. 42-1. Suneson also stated: "We will await your client's signature pages." Suneson Decl. Ex. A, at 2. Peterson responded that Plaintiff Savage is "prepared to sign" but requested that Suneson resend the SPA with the appendix attached. *Id.* at 1. Suneson resent the SPA with the appendix attached. *Id.* That evening, however, Plaintiff Savage emailed Eek refusing to sign the SPA and TAGR. Torrence Decl. ¶ 13, ECF No. 40; *see* Torrence Decl. Ex. L, ECF No. 40-12.

**STANDARDS**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Plaintiffs move for summary judgment on Defendants' first counterclaim (breach of contract), twelfth affirmative defense (accord and satisfaction), and thirteenth affirmative defense (novation). Pls.' MPSJ 1; *see also* Defs.' Answer & Countercls. ¶¶ 58–61, 67–75. Plaintiffs argue summary judgment is proper because the SPA and TAGR are not enforceable. Pls.' MPSJ 3. Plaintiffs specifically argue that the SPA and TAGR are not enforceable because they were not signed by all parties. *Id.* at 20. Defendants respond that summary judgment is improper at this stage of the proceedings, but that the SPA and TAGR are nevertheless enforceable. Defs.' Opp'n Pls.' MPSJ ("Defs.' Opp'n") 1, ECF No. 39. The Court finds that summary judgment is proper

on the current record and that the SPA and TAGR are unenforceable because they were not signed by all parties. Accordingly, the Court grants Plaintiffs' Motion.

## I. Rule 56(d)

As an initial matter, Defendants request that the Court deny or defer ruling on Plaintiffs' Motion under Rule 56(d). Defs.' Opp'n 4–6. Rule 56(d) provides that a court may defer considering a Rule 56(a) motion or deny it, "allow time to obtain affidavits or declarations or to take discovery," or "issue any other appropriate order" if a "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). "The requesting party must show: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Fam. Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008).

Here, Defendants assert that they should be entitled to depose various witnesses involved in the parties' negotiations and conduct written discovery relating to payments made by Defendants and accepted by Plaintiffs. *See* Torrence Decl. ¶¶ 18–19. Defendants argue that such discovery is essential because it will show that the SPA and TAGR are enforceable. *See id.* At oral argument, however, Defendants indicated that they had still not yet conducted or scheduled depositions of witnesses identified as essential to opposing Plaintiffs' Motion; nor did Defendants explain why evidence of previous payments to Plaintiffs was essential to oppose summary judgment. Accordingly, the Court finds that Defendants have not met their burden under Rule 56(d). Indeed, Rule 56(d) requires litigants to identify "*specific* facts" that "are *essential* to oppose summary judgment." *Fam. Home & Fin. Ctr.*, 525 F.3d at 827 (emphasis added). Defendants have done neither here.

## II. Signatures

The primary dispute in the parties' briefing is whether the SPA and TAGR are enforceable absent signatures from all parties. Plaintiffs argue that the SPA and TAGR are not enforceable because the terms of the agreements and the parties' objective manifestations of intent establish that signatures were a prerequisite to enforceability. Pls.' MPSJ 3. Defendants, on the other hand, argue that the SPA and TAGR are enforceable regardless of signatures. Defs.' Opp'n 1. The Court finds that the SPA and TAGR are unenforceable because they were not signed by all parties.

Under Oregon and California law,[2] whether a contract exists is a question of law. *Moyer v. Columbia State Bank*, 315 Or. App. 728, 737, 503 P.3d 472 (2021); *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 473 (2021). Both states apply an objective theory of contracts, meaning that in determining whether a contract exists, courts look to the "parties' objective manifestations of intent, as evidenced by their communications and acts." *Ken Hood Constr. Co. v. Pac. Coast Constr., Inc.*, 201 Or. App. 568, 578, 120 P.3d 6 (2005), *modified on reconsideration*, 203 Or. App. 768, 126 P.3d 1254 (2006); *see also Eagle Fire & Water Restoration, Inc. v. City of Dinuba*, 102 Cal. App. 5th 448, 468 (2024) ("Mutual consent is determined through an objective standard that examines the reasonable meaning of the parties' words and acts; it is not determined through silent unexpressed intentions."). "If the parties' communications and actions manifest assent to be bound by promises, they will form a contract . . . ." *Wieck v. Hostetter*, 274 Or. App. 457, 472, 362 P.3d 254 (2015); *see also Banner Ent., Inc. v. Superior Ct. (Alchemy Filmworks, Inc.)*, 62 Cal. App. 4th 348, 358–59 (1998)

---

[2] Oregon and California law apply because the TAGR and SPA are governed by Oregon and California law, respectively. Torrence Decl. Ex. J, at 3; Torrence Decl. Ex. K, at 5.

("[T]here is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense.").

Unsigned agreements are not dispositive to contract formation so long as the "parties agree on the essential terms of a contract and there is nothing left for future negotiations." *Hughes v. Misar*, 189 Or. App. 258, 264, 76 P.3d 111 (2003); *see also Symons Emergency Specialties v. City of Riverside*, 99 Cal. App. 5th 583, 601 (2024) ("[I]t is a well-established principle of contract law that when parties agree on the material terms of a contract with the intention to later reduce it to a formal writing, failure to complete the formal writing does not negate the existence of the initial contract." (internal quotation marks omitted)). If, however, "it is clearly understood that the terms of a proposed contract, though tentatively agreed on, are to be reduced to writing and signed before it is complete and binding on the parties, there is no final contract until that is done." *Gen. Realty Corp. v. Douglas Lowell, Inc.*, 223 Or. 244, 254, 354 P.2d 306 (1960) (citation omitted); *see also Banner Ent.*, 62 Cal. App. 4th at 358 ("When it is clear, both from a provision that the proposed written contract would become operative *only* when signed by the parties as well as from any other evidence presented by the parties that both parties contemplated that acceptance of the contract's terms would be signified by signing it, the failure to sign the agreement means no binding contract was created.").

Here, the Court finds that the terms of the SPA and TAGR, along with the parties' objective manifestations of intent, establish that the agreements needed to be signed by all parties to become enforceable.

Starting with the terms of the SPA and TAGR, both agreements provide that they may be *executed* in any number of *signed* counterparts. *See* Torrence Decl. Ex. J, at 4 ("This Agreement may be signed in any number of counterparts which when taken together form one complete and

executed Agreement."); Torrence Decl. Ex. K, at 5 ("This Agreement may be executed in several counterparts by one or more of the undersigned and together, all such counterparts shall be deemed to be one final Agreement, as if one document had been signed by all parties."). Both agreements provide for electronic *signatures*. *See* Torrence Decl. Ex. J, at 4 ("A signature of a Party to this Agreement sent by facsimile, electronic mail . . . , or other electronic transmission shall be valid and have the same force and effect as an original signature of such Party."); Torrence Decl. Ex. K, at 5 ("Any signature may be electronically generated and transmitted by email or other electronic means, and such signature will be valid and accepted for all purposes."). And both agreements provide signature pages. *See* Torrence Decl. Ex. J, at 5; Torrence Decl. Ex. K, at 6. The TAGR also provides the following certification on its signature page: "[T]he parties hereto have caused their duly authorized representatives to execute this Termination Agreement and General Release as of the date first written above." Torrence Decl. Ex. J, at 5. In addition, amendment of the TAGR can be achieved "only by a written instrument . . . and executed by all the Parties." *Id.* at 4. And closing of the SPA "shall take place immediately after the execution of this Agreement by the Parties." Torrence Decl. Ex. K, at 2.

Moving to the parties' objective manifestations of intent, in October 2025, Eek emailed Plaintiff Savage that Vebua "would like to offer you as a full settlement and to acquire your 5% share an amount of USD 50 000 to be paid upon *signing* of a contract to that effect." Savage Decl. Ex. 3, at 1 (emphasis added). On December 31, 2025, Eek emailed Plaintiff Savage again that Vebua would guarantee payment in order to "*sign* a termination agreement effective immediately." Torrence Decl. Ex. C, at 1 (emphasis added). In response to Vebua's December 31, 2025 email, Plaintiff Savage stated that "[i]f you are in agreement with the conditions stated

above, . . . I will have my Oregon attorney contact Steve Suneson to finalize the documents." Torrence Decl. Ex. D, at 2.

On January 4, 2026, when Peterson emailed Defendants' counsel with proposed agreements, Peterson stated that Plaintiff Savage "is ready to *finalize* and *sign* the attached as soon as we get your approval." Peterson Decl. Ex. 1 (emphasis added). On January 9, 2026, Peterson also emailed Suneson: "Please send *signature* ready documents, and [Plaintiff Savage] will *sign* – I will hold them pending confirmation of receipt of funds." Torrence Decl. Ex. F, at 2–3 (emphasis added). On January 10, 2026, Suneson "attach[ed] clean execution versions" of the SPA and TAGR "ready to be *signed*." *Id.* at 1–2 (emphasis added). Suneson's escrow instructions also provided that "[o]nce all *signed* documents have been received in escrow . . . , my client will initiate the wire," and that "[o]nce we have confirmation that the wire has actually hit [Plaintiff Savage's] account(s), all *signed signature* pages will be automatically released from escrow and have effect." *Id.* at 2 (emphasis added). Peterson responded that he had sent the SPA and TAGR to Plaintiff Savage to be *signed*. *See id.* at 1.

In Suneson's January 10, 2026 email to Peterson explaining his position on escrow, Suneson stated that "[a]s you know, the documents are NOT legally binding unless and until your client actually receives the funds" and "[m]y client will not initiate the wire until we have evidence your client has *pre-signed* and *signatures* are in my firm's escrow." Peterson Decl. Ex. 7, at 1 (emphasis added). And on January 11, 2026, in sending Defendants' signature pages to Peterson to be held in escrow, Suneson stated "[w]e will await your client's *signature* pages." Suneson Decl. Ex. A, at 2 (emphasis added).

From these undisputed facts, the Court finds it clear from the agreements as well as the parties' objective manifestations that the parties intended that the SPA and TAGR would only

become enforceable when signed by all parties. Indeed, as specified by Suneson, without signed agreements from Plaintiffs, Defendants would not initiate the wire transfer, and without the wire transfer, the SPA and TAGR are "NOT legally binding." Peterson Decl. Ex. 7, at 1; *see also* Savage Decl. Ex. 8 (email from Suneson to Plaintiff Savage on December 19, 2025, stating that "no agreements will be released from escrow, i.e., not legally effective, until you have actually received the payments"), ECF No. 36-8. In addition, both the SPA and TAGR contain provisions regarding signed counterparts like those in *PSM Holding Corp. v. National Farm Financial Corp.*, 339 F. App'x 693, 694 (9th Cir. 2009).

Defendants argue that the parties' signatures were merely a prerequisite for consideration due under the SPA and TAGR, and that the parties reached an enforceable agreement either on January 9, 2026, or January 10, 2026, according to the parties' emails. *See* Defs.' Opp'n 11–14 (citing Torrence Decl. Ex. F, at 1–3). Yet, the parties' communications show that they continuously negotiated the terms of their agreement up until Plaintiff Savage's rejection. *See Small v. Paulson*, 187 Or. 76, 85, 209 P.2d 779 (1949) ("It is axiomatic that to constitute a contract based upon offer and acceptance the acceptance must coincide with and be in the same terms as the offer, and that if a new provision is suggested the answer is a mere counter-offer, and, until that has been assented to by the one making the offer, there is no meeting of the minds and hence no contract."). Indeed, as of the evening of January 10, 2026, the parties were still negotiating the terms of escrow. *See* Peterson Decl. Ex. 7, at 1–3. Suneson's email from January 10, 2026, even requests that Peterson confirm whether "we are still proceeding tomorrow so I can inform my client." *Id.* at 1. And as of the morning of January 11, 2026, Suneson had not yet sent a fully executed SPA, with appendices, for Plaintiffs to sign. *See* Suneson Decl. Ex. A, at 1–2.

Because the terms of the agreements and the parties' objective manifestations establish that the SPA and TAGR needed to be signed by all parties to be enforceable, and Plaintiffs did not sign the agreements, the Court finds the SPA and TAGR are unenforceable. *See Gen. Realty Corp.*, 223 Or. at 254; *Banner Ent.*, 62 Cal. App. 4th at 358. Accordingly, the Court finds summary judgment on Defendants' breach of contract counterclaim, accord and satisfaction affirmative defense, and novation affirmative defense proper. *See Huskey v. Oregon Dep't of Corr.*, 373 Or. 270, 275, 564 P.3d 142 (2025) (explaining that to prevail on a breach of contract claim, a party must establish the "existence of a contract"); *Wells Fargo Bank, N.A. v. Kimble*, No. CV 20-09848 JVS (PVCx), 2021 WL 9526877, at *3 (C.D. Cal. June 16, 2021) ("Under California law, a breach of contract requires that a plaintiff must show . . . the existence of the contract . . . ."); *Barinaga v. JP Morgan Chase & Co.*, 749 F. Supp. 2d 1164, 1175 (D. Or. 2010) (explaining that, under Oregon law, an accord and satisfaction requires a new contract); Cal. Civ. Code § 1521 (defining an "accord" as "an *agreement* to accept, in extinction of an obligation, something different from or less than that to which the person agreeing to accept is entitled" (emphasis added)); *Miles v. Bowers*, 49 Or. 429, 432, 90 P. 905 (1907) ("One of the essential elements to a novation . . . is that there should have been a mutual *agreement* between all of the parties that the old debt should become the obligation of a new debtor." (emphasis added)); Cal. Civ. Code § 1532 ("Novation is made by contract, and is subject to all the rules concerning contracts in general.").[3]

[3] On October 26, 2026, Defendants filed a supplemental brief identifying a decision from the Oregon Court of Appeals. *See* Defs.' Suppl. Submission 2, ECF No. 52 (citing *Bridge City Fam. Med. Clinic, P.C. v. Kent & Johnson, LLP*, 270 Or. App. 115, 346 P.3d 658 (2015)). Defendants argue that *Bridge City* mirrors the facts and issues in this case. *Id.* at 3. The Court finds *Bridge City* distinguishable. In *Bridge City*, the mutual release was accepted without qualification. *See* 270 Or. App. at 123 ("Bunker expressed no disagreement or concern regarding a mutual release."). Indeed, the "signing of the release was a condition precedent to the

## CONCLUSION

The Court GRANTS Plaintiffs' Motion for Partial Summary Judgment [34].

IT IS SO ORDERED.

DATED this 27th day of October, 2026.

AMY M. BAGGIO
United States District Judge

performance of the contract." *Id.* at 124. Here, by contrast, the parties disputed the terms and conditions of the SPA and TAGR, including the process for signing them, up until Plaintiffs ultimately rejected the agreements. *See, e.g.*, Peterson Decl. Ex. 7 (showing the dispute between Peterson and Suneson regarding the escrow process). Thus, unlike *Bridge City*, it cannot be said that the parties here had "nothing left for future negotiations." *Hughes*, 189 Or. App. at 264. Rather, it was "clearly understood" that the parties' agreement was "to be reduced to writing and signed" before becoming enforceable. *Gen. Realty Corp.*, 223 Or. at 254.